UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Donald Vry,

Plaintiff,

v.

Martin Marietta Materials, Inc.,

Defendants.

Civ. File No. 01-2139 (PAM/SRN)

**MEMORANDUM AND ORDER FOR JUDGMENT**

---

This matter was tried to the Court during the week of January 6, 2003. Plaintiff claims that Defendant breached a severance agreement by failing to make sufficient severance payments. For the reasons that follow, the Court determines that Plaintiff is not entitled to the benefits he seeks to recover.

**BACKGROUND**

The parties' dispute centers around the corporate merger of Meridian Aggregates, Inc. ("Meridian") and Martin Marietta Materials, Inc. ("Martin Marietta"). The smaller of the companies, Meridian, had actively sought a merger of this kind for some time. To protect certain executives from possible harm as a result of a planned merger, Meridian implemented a Change of Control Agreement. The agreement provided severance benefits for those executives of Meridian. Martin Marietta specifically adopted these provisions when it bought Meridian.

Plaintiff Donald Vry was a Senior Vice President at Meridian, a partner, and part-

FILED FEB 1 0 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD FEB 1 0 2003
DEPUTY CLERK

owner of the company. As a Senior Vice President, Vry was covered by the protections contained in the Change of Control Agreement. After Meridian had been purchased, the Change of Control Agreement allowed covered employees to terminate their employment with the new company for good reason or for no reason at all and receive severance benefits. Should the protected employee quit for good reason, he or she would be entitled to a lump sum payment of 150% of his or her yearly base salary along with continuation of health and life insurance benefits for 18 months or until the employee finds re-employment. The lower tier of the two-tier program enabled employees to quit their for no reason at all. These employees would receive a lump sum payment of 75% of their yearly base salary and continued benefits for 9 months or until re-employment. The agreement defined "good reason"as the purchasing company doing any of the following, unless the company corrects the act or failure to act within five business days: (1) the failure of the new company to provide compensation and benefits to the employee "at levels consistent with the levels provided prior to [the] change in control;" or (2) "a meaningful alteration, adverse to the [employee], in the nature and status of his responsibilities;" or (3) a requirement by the new company that the employee "relocate his place of work more than 30 miles from his place of work in effect at the time of the change." (Pl's. Ex. 1.)

In April 2001, Defendant Martin Marietta Materials, Inc. ("Martin Marietta") purchased Meridian and determined that the Change of Control Agreement remained in effect. On May 8, 2001, Vry sent a letter to Martin Marietta, threatening to voluntarily terminate his employment with Martin Marietta and exercise his rights under the Change of

Control Agreement. (Pl's. Ex. 2.) Vry claims that the change in ownership resulted in changes in his benefits, compensation, job status, and job duties. Vry asserts that the changes satisfy the definition of "good reason" entitling him to the top tier severance amount, or 150% of his base yearly salary. There is no dispute that Martin Marietta paid him according to the lower tier of the two-tier program, at 75% of his base salary, and Vry now seeks to recover the remaining 75%, or about $105,000.

Neither party claims that the agreement contains ambiguity or that the language in the Change of Control Agreement is unclear. Instead, the parties dispute whether the change in control resulted in changes to Vry's compensation or to his employment duties. Changes to either would qualify Vry for the top tier of the severance plan and entitle him to recover an additional 75% of his base salary in severance benefits.

**DISCUSSION**

**A. Compensation**

The Change of Control Agreement provides that an employee may receive 150% of his or her yearly base salary as severance if the purchasing company fails "to provide compensation and benefits to the Manager at levels consistent with the levels provided prior to such Change in Control." (Pl's. Ex. 1.) At trial, Vry contended that the compensation and benefits he received as an employee of Meridian differed dramatically from the compensation and benefits that he received as an employee of Martin Marietta. However, the Court finds that the facts in this case do not support his contention. Instead, the record shows that Martin Marietta provided benefits and compensation at levels consistent with the levels that

Meridian provided.

In response to some of the evidence at trial detailing the compensation and benefits plans offered by Martin Marietta, Vry claimed that he had no knowledge of the specifics of the contested programs. The Court observes that Vry left his job shortly after the merger became complete. Given the complexities involved in a corporate merger of this size, employees must inevitably accept a slight delay in the dissemination of the particulars of a transition from one pension plan to another, from one type of medical coverage to another, and from one calculus of vacation time and bonus awards to another. Nothing in the record shows that the conduct of Martin Marietta constituted an aberration so great as to give credence to Vry's suggestion that the Court fault Martin Marietta for Vry's lack of knowledge. In the Court's analysis of the of compensation and benefits packages offered by each company, Vry's professed knowledge or lack of knowledge of the programs carries little weight. Martin Marietta timely provided sufficient details of both plans and of the transition schedule to its employees.

The Court concludes that Martin Marietta did not offer compensation and benefits at levels below those offered by Meridian. For example, while Martin Marietta would not increase Vry's salary at the rate he supposed Meridian would, the salary remained the same and did not decrease. Likewise, Martin Marietta proved that Vry could receive salary bonuses consistent with those he could have expected to receive from Meridian. Both companies anticipated a flexible bonus based on similar factors that was not likely to exceed 35% of an employee's salary. Moreover, the 401K plan offered by Martin Marietta closely

corresponds to the plan offered by Meridian. Meridian would match its employees' contributions on a dollar-for-dollar basis up to 4% of the employees' contribution. Martin Marietta's plan only matched employee contribution on a fifty cents-per-dollar basis. However, Martin Marietta also allowed contributions on up to 7% of the employees' contribution. Both companies provided Vry with use of a company SUV. Both provided long-term disability insurance coverage up to 50% of the employee's salary. Martin Marietta's pension plan, while different from the defined contribution plan used by Meridian, in fact conferred a greater benefit on its employees than the Meridian pension plan. (See Test. of Jonathan T. Stewart.) Both companies offered five weeks of vacation as well, although Vry terminated his employment with Martin Marietta before the five-week vacation plan was in place.

Finally, while the health insurance programs offered by each company require participating employees to contribute to the program in different ways, they impose similar burdens. Under the Meridian plan, employees had extremely high deductibles, accompanied by negligible premiums. The Martin Marietta insurance program required employees to pay monthly premiums and an additional 15% co-pay, but had no deductible. Whether the change to the Martin Marietta co-pay plan adversely affected Vry depends on whether one of the plans exposes him to greater risk of personally incurring health care costs. In comparing the two plans, the Court finds that both of them reflect similar and reasonable calculations and allocations of that risk, from an employee's perspective. Therefore, Martin Marietta provided compensation and benefits to Vry that closely resemble the compensation

and benefits levels offered by Meridian. The differences revealed in the record do not amount to inconsistencies sufficient to trigger the good cause provisions of the Change of Control Agreement.

### B. Employment Responsibilities

The Change of Control Agreement allows an employee to receive 150% of his or her yearly salary in severance if that employee has good cause for voluntarily terminating employment. The contact provides that an employee can establish good cause if, as a result of the merger, there is "a meaningful alteration, adverse to the Manager, in the nature or status of his responsibilities or in his position." Vry alleged that the merger brought about changes in his job status, such as a reduction in his authority over subordinates and in his contact with the company's CEO and Board of Directors.[1] In addition, Vry argued that as a result of the merger, the nature of his job changed in two ways. First, Vry claimed that he no longer was involved with tasks such as engineering, permitting, and exploration. Second, Vry stated that he had responsibility for far fewer projects after the merger than he did as an employee of Meridian. The Court finds that the only job changes established by the evidence at trial do not constitute "meaningful changes," and they do not trigger the good cause provisions of the Change of Control Agreement.

---

[1] Vry noted that while he was a "Senior Vice President" at Meridian, his job title at Martin Marietta was interchangeably listed as "General Manager," (Pl's. Ex. 6), "Vice-President/General Manager," (Pl's. Ex. 4), and "Senior Vice President," (Pl's. Ex. 5). Companies affix different labels to their employees' positions according to each company's individual preferences. Even assuming Vry had proved which of the three titles actually applied to his position at Martin Marietta, this evidence is insufficient to support a finding that Vry's alleged change in job title constitutes an adverse and meaningful change to his job status.

At Meridian, Vry had the authority to hire and fire employees and had regular contact with the CEO and the Board of Directors of Meridian. Vry argued that at Martin Marietta he had to obtain the permission of his supervisor to hire or fire employees and no longer had any personal contact with the Board of Directors. Vry also had to report to Robert Meskimen, a supervisor, instead of directly reporting to the CEO, and he considered his job title at Martin Marietta to signify a demotion from his position at Meridian. These changes did not materially alter Vry's employment status, however. The fact that Vry had to consult with Meskimen before hiring or firing employees did not adversely affect Vry. To some extent, this perceived restraint on Vry's authority is unavoidable when a large company purchases a smaller entity. In the same way, Vry's contact with the Board of Directors and the CEO while at Meridian is not a component of his job status, but rather a function of the size and corporate structure of Meridian. Therefore, a preponderance of the evidence does not support Vry's claim that the merger adversely and meaningfully affected the nature or status of his employment position.

Vry also failed to carry his burden to establish that the merger resulted in meaningful changes in the nature of his responsibilities. Vry alleged that at Martin Marietta he could no longer assist in engineering, legal, or permitting tasks. Further, Vry had authority to conduct exploration only when necessary to the operation of his four quarries at Martin Marietta, while at Meridian, he conducted exploration for facilities outside of these primary projects. Vry also contends that the number of his projects dramatically decreased as a result of the merger. First, the Court again observes that some of the complained-of actions are

unavoidable. Martin Marietta has centralized many of the tasks that Vry was involved with at Meridian. For instance, the evidence presented at trial showed that a central legal department handled contract negotiation and permitting at Martin Marietta, whereas Vry worked with lawyers in negotiating contracts for Meridian. Similarly, centralized staff engineers conducted engineering tasks at Martin Marietta, while Vry worked directly with engineers at Meridian. These differences do not fall within the kinds of correctable and adverse changes contemplated by the Change of Control Agreement.

Second, Vry's primary job, the management of four quarries, did not change after the corporate transition was completed. Vry documented additional job responsibilities and projects as a Meridian employee that he did not have as a Martin Marietta employee. However, testimony at trial showed that the CEO of Meridian, Tommy Bronson, occasionally asked Vry to take on many additional projects that were not part of his regular job duties. That same testimony revealed that some of the other projects for which Vry was responsible as a Meridian employee were temporary in nature and were no longer active by the time the companies completed their merger. Additional testimony and evidence established that during his brief employment with Martin Marietta, the company offered to give Vry an additional project, but he declined to accept the added responsibility. Therefore, Vry failed to prove that, as a result of the merger, the nature of his job changed in a meaningful and adverse way.

**CONCLUSION**

Plaintiff failed to prove that the conditions giving rise to good cause under the Change

of Control Agreement occurred. Martin Marietta provided Plaintiff with benefits and compensation consistent with those offered by Meridian. In addition, the merger did not meaningfully and adversely change Vry's job status or responsibilities. Accordingly, **IT IS HEREBY ORDERED** that judgment be entered in favor of Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 7, 2003

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*